# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JOHN SCHMIDT, et al.,

        Plaintiffs,

     v.                                  Case No.  08-C-1035

BASSETT FURNITURE INDUSTRIES, et al.,

        Defendant.

## DECISION AND ORDER

      This action, which was removed from state court, seeks damages and other relief based on claims for breach of contract, fraudulent marketing, theft, racketeering, conspiracy, and common law fraud.  The plaintiffs, and members of the class on whose behalf the plaintiffs seek to bring this action, were customers who contracted to purchase furniture and furnishings during a liquidation sale at the Appleton Bassett Furniture Direct ("Bassett Direct") store, which was an authorized dealer of Defendant Bassett Furniture Industries, Inc ("Bassett").  The sale was conducted by Defendant Wahlquist Management Corporation ("Wahlquist").  The complaint alleges that the named plaintiffs and class members made down payments or payments in full for furniture, ranging from several hundred dollars to approximately $10,000, but never received the items they ordered.  Instead, their payments were used to pay Wahlquist's commissions and to retire the store's pre-existing debt to Bassett.  Bassett Direct went out of business shortly thereafter, and the owners have since filed for bankruptcy.

The plaintiffs allege that Bassett Direct was acting as Bassett's agent in the liquidation sale and that Bassett is therefore liable under contract law for the damages resulting from the non-delivery of their furniture. To the extent Bassett denies that Bassett Direct was its agent, the plaintiffs allege that Bassett is liable for fraudulent advertising in violation of Wis. Stat. 100.18. Plaintiffs also allege that Bassett entered into a joint venture and/or conspiracy with Wahlquist to defraud them. Based upon this allegation, plaintiffs assert additional claims for theft, fraud, conspiracy, and violations of state and federal racketeering statutes against both Bassett and Wahlquist.

Federal jurisdiction exists under 28 U.S.C. §§ 1331 and 1332, and the case is presently before the Court on both defendants' Rule 12(b)(6) motions to dismiss. For the reasons that follow, the defendant's motion will be granted as to Counts Four, Five and Seven. The motion will be denied as to the remaining Counts, although Count Six appears to overlap with Count Three and may be redundant.

## STANDARDS GOVERNING MOTIONS TO DISMISS

The standards governing a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure seem to be shifting. Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." In deciding whether it is sufficient to state a claim, the court must "accept[ ] the complaint's well-pleaded allegations as true and draw[ ] all favorable inferences for the plaintiff." *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). Until recently, unless the heightened standards of Rule 9(b) applied, a complaint was considered sufficient if it provided bare notice of the claim the plaintiff was making. In the words of the Seventh Circuit:

> Federal complaints plead claims rather than facts. . . . It is enough to name the plaintiff and the defendant, state the nature of the grievance, and give a few tidbits (such as the date) that will let the defendant investigate. A full narrative is unnecessary. . . . Details come later, usually after discovery-though occasionally sooner if, as the rules allow, either side seeks summary judgment in advance of discovery, or the district court orders the plaintiff to supply a more definite statement.

*Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 714 (7th Cir. 2006) (citations omitted).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007), and *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1953 (2009), however, the Supreme Court raised this pleading standard, albeit slightly. In *Twombly* the Court expressed a concern with the substantial cost and burden of discovery imposed on a defendant in complex anti-trust litigation by implausible allegations that may be intended merely to extort a settlement. *Twombly*, 550 U.S. at 558. A Rule 12(b)(6) motion to dismiss is intended to avoid this waste of time and money by the parties and the court by terminating the litigation at the earliest point in time "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief . . . ." *Id. Twombly* therefore held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . . Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555 (citations omitted). They must be sufficient to make the claim plausible. *Id.* at 556-58.

*Iqbal*, decided this last term, made clear that *Twombly*'s plausibility standard applies in all federal cases, not just to antitrust cases. 129 S. Ct. at 1953 ("Our decision in Twombly expounded the pleading standard for 'all civil actions,' . . . .") (quoting Fed. R. Civ. P. 1.). *Iqbal* also emphasized *Twombly*'s rejection of bare legal conclusions as sufficient to survive a Rule 12(b)(6)

3

motion to dismiss. *Id.* at 1950 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). Ultimately, the question a court must decide when faced with a Rule 12(b)(6) motion is whether the complaint states sufficient facts to make the claim plausible: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.*, at 1949 (quoting *Twombly*, 550 U.S. at 570). Yet, the Court has cautioned that probability is not the standard. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . .Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557). Plaintiffs now must at least allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *Iqbal*, 129 S.Ct. at 1951.

Other than this almost imperceptible change, hardly a bright-line rule, the other principles governing the determination of motions to dismiss have not changed. Generally, a court must limit its review to the allegations of the complaint in deciding a Rule 12(b)(6) motion to dismiss. When matters outside the pleadings are presented to and not excluded by the court, the motion should be treated as one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). An exception to this rule exists, however, as to documents that are referred to in the complaint and that are central to the plaintiff's claim. The court may consider those kinds of documents without converting the motion to one seeking summary judgment. *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009). If the plaintiff fails to attach such documents to the complaint, the defendant may submit them in

4

support of his Rule 12(b)(6) motion to dismiss. *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir.2002). And where the authenticity of such a document is undisputed, "[t]he court is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material." 5 Wright & Miller, *Federal Practice & Procedure: Civil 2d*, § 1327 at 766 (1990); *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002).

Finally, claims sounding in fraud require greater specificity. Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The purpose of the heightened pleading standard in fraud cases is "to force the plaintiff to do more than the usual investigation before filing his complaint." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). The justification for imposing this duty on plaintiffs arises from the very nature of claims of fraud:

> Greater precomplaint investigation is warranted in fraud cases because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual) . . . . because fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it . . . . and because charges of fraud (and also mistake, the other charge that Rule 9(b) requires be pleaded with particularity) frequently ask courts in effect to rewrite the parties' contract or otherwise disrupt established relationships.

*Id.* (citations omitted). To guard against these dangers, the heightened pleading standard mandated by Rule 9(b) has been construed to require "the plaintiff to state 'the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.' " *Uni*quality v. Infotronx*, 974

5

F.2d 918, 923 (7th Cir. 1992) (quoting *Bankers Trust Co. v. Old World Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir.1992)).

It is with these standards in mind that I now turn to the specific claims plaintiffs have asserted. Plaintiffs have brought seven claims in all, the first two of which are against Bassett only.

**A. Breach of Contract**

Plaintiffs' first claim is that Bassett breached the contracts for the sale of furniture it had with the plaintiffs and class members by:

a.  failing to deliver the goods contracted for;

b.  delivering furniture or furnishings that were unmerchantable, damaged, of lessor quality or otherwise different from what had been represented to the buyer;

c.  violating the obligations of good faith and fair dealing provided under Wis. Stat. §§ 401.203 and 402.103(b);

d.  violating the implied warranties of merchantability and fitness provided for in Wis. Stat. §§ 402.314 and 402.315.

(2nd Am. Compl. ¶ 30.) The complaint alleges that in 2003, Bassett entered into a series of agreements with David Ewald, his wife Amy, an affiliated company named Ewald Enterprises, LLC, and the company's shareholders (collectively, "Ewald"), under which Ewald was to operate the Appleton Bassett Direct store. (*Id.* ¶ 10.) Although it is clear that plaintiffs entered into their contracts to purchase furniture with Bassett Direct, the complaint alleges that "[a]t all relevant times and in all relevant respects, the Ewalds were Bassett's actual agents in the operation of that store . . . ." (*Id.* ¶ 11.) Alternatively, the complaint alleges that Bassett created the appearance that Ewald was acting as its agent, thereby rendering Bassett liable "for all breaches of contract, theft, fraud and other misconduct by the Ewalds in connection with the Appleton Bassett Furniture Direct

6

store . . . ." (*Id.* ¶ 12.)  There is no allegation that any of the plaintiffs dealt directly with Bassett. Thus, the breach of contract claim against Bassett hinges on the assertion that Ewald and/or Bassett Direct acted as Bassett's agent with either actual or apparent authority to bind it in contract.

### 1. Actual Agency

Agency is a fiduciary relationship which rests on the consent of the parties.  In the words of the Restatement,

> Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.

RESTATEMENT (THIRD) AGENCY § 1.01 (2006).  Wisconsin follows the Restatement on the issue. *See, e.g., Johnson v. Minn. Mut. Life Ins. Co.*, 151 Wis.2d 741, 748, 445 N.W.2d 736 (Ct. App. 1989) ("The relationship exists 'only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act.'") (quoting RESTATEMENT (SECOND) OF AGENCY § 15 (1957)).  *Rule v. Jones*, 256 Wis. 102, 110, 40 N.W.2d 580 (1950). Thus, absent an agreement between Bassett and Ewald that Ewald was to act as Bassett's agent, no agency relationship could exist.

Although plaintiffs allege that Ewald was Bassett's actual agents, the allegation is belied by the agreements between Ewald and Bassett that are referenced in the complaint. The Bassett Direct Dealer Agreement expressly provides:

> Dealer acknowledges that it is an independent contractor.  Dealer is not authorized to act for, incur debt for, or make any representations or warranties on behalf of [Bassett].  Dealer shall not represent itself to the public as an agent or representative of Bassett.  Dealer shall be solely responsible for any representations or warranties that are not authorized by [Bassett] in writing or stated in [Bassett]'s promotional materials.

7

(Dau Aff., Ex. A1, P 9.)  Notwithstanding plaintiffs' allegations of an agency relationship, this language makes clear that Bassett did not consent to allow Ewald to act as its agent or enter into contracts on its behalf.  In fact, the Dealer Agreement expressly denies such authority.  The unsupported and conclusory allegations of the complaint cannot control over the clear and unambiguous language of the Dealer Agreement.  Accordingly, to the extent plaintiffs' breach of contract claim rests upon the allegation of an actual agency relationship between Bassett and Bassett Direct and/or Ewald, it will be dismissed.[1]

## 2.  Apparent Agency

Even if an agent lacks actual authority to bind his principal, a contract may nevertheless become binding on the principal if the agent acts with apparent authority.  The Wisconsin Supreme Court has explained the doctrine of apparent authority:

> Under apparent authority, a principal may be held liable for the acts of one who reasonably appears to a third person, through acts by the principal or acts by the agent if the principal had knowledge of those acts and acquiesced in them, to be authorized to act as an agent for the principal. . . . For liability to exist, three elements must be present: "(1) Acts by the agent or principal justifying belief in the agency; (2) knowledge thereof by the party sought to be held; (3) reliance thereon by the plaintiff, consistent with ordinary care and prudence.

*Pamperin v. Trinity Memorial Hosp.*, 144 Wis.2d 188, 203, 423 N.W.2d 848, 853-54(1988) (citation omitted); *see also ABC Outdoor Advertising, Inc. v. Dolhun's Marine, Inc.*, 38 Wis. 2d 457, 461, 157 N.W.2d 680, 682 (1968) ("'It is the well-settled rule that, if a principal so conducts

---

[1] Relying on *Kerl v. Dennis Rasmussen, Inc.*, 2004 WI 86, ¶ 43, 273 Wis. 2d 106, 682 N.W.2d 328, plaintiffs place great emphasis on the issue of whether Bassett controlled Ewald's activities.  The issue in *Kerl*, however, was whether a franshisor could be held vicariously liable for the tort of its franchisee.  Control or the right of control is necessary in order to establish vicarious liability of a principal for the torts of its agent.  Consent or the appearance of consent, not control, is the crucial question where, as here, the issue is the principal's liability for a contract allegedly entered into on its behalf by its alleged agent.  Thus, *Kerl* is largely inapposite.

8

his business as to lead the public to believe that his agent has authority to contract in the name of the principal, he is bound by the acts of such agent within the scope of his apparent authority as to contracts with persons who, acting in good faith, believe, and have reasonable ground to believe, that the agent has such authority.'") (quoting *Sickinger v. Raymond*, 178 Wis. 439, 446, 190 N.W. 93, 95 (1922)).

Plaintiffs argue the complaint states a claim for breach of contract against Bassett under this doctrine. The complaint alleges that the store where they purchased the furniture bore the Bassett Direct sign, the order forms used for the transactions bore the name "Bassett Furniture Direct," and most of the customers were ordering furniture being made by Bassett. Yet, there was no disclosure that customers were in fact not dealing "directly" with Bassett Furniture Industries. (Pl.'s Compl. ¶ 11.) The plaintiffs also allege that Bassett knew Ewald was holding itself out to be Bassett's agent, because Bassett was integral in the design and advertising that "justified the belief by customers in the agency relationship" that occurred throughout the store's operating history. (Pl.'s Compl. ¶ 12.) Finally, the plaintiffs allege that they relied on the belief that Ewald was, in fact, Bassett's agent, and this reliance was "consistent with ordinary care and prudence." (Pl.'s Compl. ¶ 12.) (quoting *Pamperin,* 144 Wis.2d at 203, 423 N.W.2d at 854).

Bassett, in response, notes that apparent agency requires, at the very least, affirmative acts or knowing acquiescence on the part of the putative principal that reasonably induce the belief on the part of a third party in the supposed agent's power to bind it. (Bassett Br. Supp. Mot. To Dismiss at 10.) The only such act alleged in the complaint, according to Bassett, consists of the name under which Ewald operated the store. The commercial reality of today, Bassett argues, precludes any consumer from reasonably believing, based on a retailer's use of a manufacturer's or

9

licensor's name, that he or she is contracting directly with the manufacturer or licensor whenever he or she makes a purchase. (*Id.* at 11.) That commercial reality, Bassett notes, includes "literally scores if not hundreds of dealer and franchise distribution systems (including fast food and sit-down restaurant chains, hotels and motels, consumer electronics, shoes, clothing automobiles and auto supplies, pharmacies, appliances, hardware and many more) in which an independent owner operates under the name of the flagship supplier." (*Id.*) If permission to use a franchisor's trade name is sufficient to bind the franchisor to its franchisee's contracts, Bassett argues, "then no franchisor or licensor in the United States will be safe from claims like this." (Bassett Reply Br. at 9.)

At the outset, I note that Bassett did more to create the impression that those walking into the Bassett Direct store were dealing directly with Bassett than simply allow its name to be used in the store's name. Bassett specified "signs and other identification elements for each Bassett Direct Store." (Dau Aff., Ex. A-1, ¶ 5.) Not only did the use of the name "Bassett Furniture Direct" suggest that those dealing with the store were dealing directly with Bassett, but Bassett apparently specified no signs that would have corrected this misunderstanding. In addition, Bassett dictated the order forms that were used by the store (*id.* ¶ 11), which likewise failed to identify the true owner of the store.

Even aside from these additional actions by Bassett that gave rise to an appearance of agency, however, the fact that franchising has become a common way of doing business, does not mean that it is unreasonable for consumers to assume, at least in some cases, that the name on the store they walk into is the company with whom they are doing business. The primary reason an owner pays for the right to use a nationally known business or trade name in his own business, after

10

all, is to encourage consumers to identify his business with the good will associated with the national business or trade name. One commentator has described franchises as a method of "fooling" customers about who they are actually dealing with:

> Uniform stores, signs and management methods give the consumer the impression that they are dealing with a standardized business operation. This impression, in turn, gives greater market value to the franchisor's trademark and the franchised operation generally. Indeed, the franchise contract typically requires franchisees to join in the franchisor's efforts to "fool the customer"; in other words, maintain the illusion that the business consists of uniform, wholly integrated outlets when, at least according to law, the "chain" actually consists of separate, independent businesses.

Emerson, Robert W., *FRANCHISORS' LIABILITY WHEN FRANCHISEES ARE APPARENT AGENTS: AN EMPIRICAL AND POLICY ANALYSIS OF "COMMON KNOWLEDGE" ABOUT FRANCHISING*, 20 Hofstra L. Rev. 609, 630 (1992) (footnotes omitted).

Of course, to the extent the trade name conveys to the consumer only the fact of a standardized way of doing business, there should be no confusion. It is where the message conveyed is that the retail store *is* a local branch of the national business that apparent agency can arise. Some franchises, especially of the fast food variety, have become so ubiquitous that a court may be able to determine as a matter of law at the pleading stage that a consumer cannot reasonably believe that in doing business with a local store he or she was dealing with the national corporation. But this is not such a case. Bassett is not McDonalds or General Motors. And by calling its dealers Bassett Furniture *Direct*, Bassett only reinforces the message that when a consumer walks into a Bassett Direct store, he or she is dealing directly with Bassett.

Bassett's argument that allowing plaintiffs' claim to proceed will subject all franchisors or licensors to similar claims and thereby undermine an established way of doing business ignores those steps that a franchisor of licensor can take to insure there is no confusion. Almost forty years

11

ago the Supreme Court of Minnesota rejected the argument that franchising, at that time a relatively new way of doing business, would be disrupted by imposing liability under similar circumstances, stating

> We are not impressed that this will be the effect of our decision. Franchisers can protect themselves from liability by insuring that their franchisee outlets make it clear to their customers and creditors that they are not dealing with a franchiser but with an independent business as a franchisee. This can be accomplished in the name it employs and in advertising which candidly discloses the relationship which exists.

*Duluth Herald and News Tribune v. Plymouth Optical Co.*, 286 Minn. 495, 502, 176 N.W.2d 552, 557-58 (1970) (holding that the conduct of defendant franchiser in authorizing and permitting the franchisee to use its trade name three years created an apparent authority in the franchisee to bind defendant franchiser); *see also Iowa National Mut. Ins. Co. v. Backens*, 51 Wis. 2d 26, 186 N.W.2d 196 (1971) (holding that though manufacturer's allowing tire recapper to use its signs, invoices, and emblems was enough to create appearance of agency, claim failed because customer did not rely on manufacturer in choosing to do business with recapper).

Bassett argues that it is apparent from the form sales contract used in the transactions, a copy of which plaintiffs attached to their complaint, that they were not dealing with the national furniture store but only a local dealer. The name Bassett Furniture Direct appears at the top of the form with the Appleton address and states that "all warranty claims (if any exist) will be handled through the manufacturer, **not this store**." (2nd Am. Compl., Ex. C.) (emphasis original). This language establishes, Bassett argues, "that the store and the (unnamed) manufacturer are separate entities." (Bassett Br. In Supp. of Mot. for S.J. at 11, n. 6.) Bassett further argues that the use of the word "direct" in the store's name suggests only "the absence of the much-maligned 'middle man' and the commensurate savings involved when the *retailer* obtains goods directly from the manufacturer." (*Id.*) (emphasis original).

12

I cannot agree. Taking the latter argument first, the store's name does suggest an agency relationship because, to the typical consumer, the retailer is the middle man. The use of the name Bassett Furniture Direct therefore suggests that when the consumer walks into the store, he or she is dealing directly with Bassett. Moreover, nothing in the form contract would dispel that impression. The form does not even identify Ewald Enterprises, LLC, the legal name of the party with whom the consumer is actually contracting. There is no disclaimer to warn consumers that Bassett Direct is not an agent for the national corporation. Indeed, the fact that orders for future delivery are being taken at a liquidation sale reinforces the impression that the local store is not acting on its own. Viewed in this context, the fact that the form distinguishes the store from the manufacturer is not sufficient to alert the consumer that Bassett Direct was not Bassett's agent.

In sum, I cannot say based on the allegations of the complaint and the documents referenced therein that plaintiffs' allegation of an apparent agency relationship between the Ewalds and Bassett is implausible. Accordingly, Bassett's motion to dismiss plaintiffs' breach of contract claim on the basis of apparent authority is denied. To the extent the claim is based on an allegation of actual authority, it is granted.

**B. Count 2: Fraudulent Marketing**

Count 2 of the complaint is a fraudulent marketing claim against Bassett in violation of Wisconsin's Deceptive Trade Practices Act ("DTPA"). *See* Wis. Stats. § 100.18. Plaintiffs contend that by causing the "Bassett Furniture Direct" sign to be prominently displayed on the exterior of Ewald's store, Bassett led the plaintiffs to believe that they would be dealing "directly" with Bassett Furniture Industries, when in fact they were not, thereby violating section 100.18(1) of the DTPA. Thus, plaintiffs contend, Bassett, who was responsible for placement of the signs, engaged in

13

fraudulent, or at least deceptive, marketing and is liable for the full amount of their losses together with attorneys fees under section 100.18(11)(b) of the Wisconsin Statutes.

To prevail on a claim under the DTPA, a plaintiff must prove three elements:

First, that with the intent to induce an obligation, the defendant made a representation to "the public." Wis. Stat. § 100.18(1). Second, that the representation was untrue, deceptive or misleading. *Id.* Third, that the representation caused the plaintiff a pecuniary loss. Wis. Stat. § 100.18(11)(b)2.

*K & S Tool & Die Corp. v. Perfection Machinery Sales, Inc.*, 2007 WI 70, ¶ 19, 301 Wis.2d 109, 732 N.W.2d 792. Plaintiffs allege that they were misled by the Bassett Furniture Direct sign that Bassett caused to be prominently displayed in front of the Appleton Bassett Direct store. "This plainly and unambiguously meant," plaintiffs contend, "that in dealing with Ewald and the salespersons in that store, they were dealing directly with Bassett." (2nd Am. Compl. ¶ 33.) If Bassett denies that Ewald was its agent, plaintiffs allege that the sign and other indicia of agency described in the complaint constitute fraudulent advertising. (*Id.* ¶ 34.) Plaintiffs also note that the DTPA requires owners of stores such as Bassett Direct to keep a conspicuous sign on both the outside and in the sales area of the inside of the store "which shall clearly state the name of the association, corporation or individual who actually owns said merchandise, property or service which is being offered to the public and not the name of any other person . . . ." Wis. Stat. § 100.18(5). Bassett, who under its Dealer Agreement had the right to specify the "signs and other identification elements for each Bassett Furniture Direct Store" (Dau Aff., Ex. A1, ¶ 5), apparently did not specify such a sign at the Appleton store. (2nd Am. Compl. Ex. A.) These allegations, plaintiffs contend, are sufficient to state a claim under the DTPA.

14

On initial consideration, it appears that plaintiffs' DTPA claim is logically incompatible with their invocation of the doctrine of apparent agency. If plaintiffs succeed in proving that Bassett led them to believe that in dealing with Bassett Direct they were dealing with Bassett, they will suffer no pecuniary loss. For in that event, Bassett is liable to them under a theory of apparent agency. As stated above, if a principal so conducts his business as to lead the public to believe that his agent has authority to contract in the name of the principal, he is bound by the acts of such agent within the scope of his apparent authority as to contracts with persons who, acting in good faith, believe, and have reasonable ground to believe, that the agent has such authority. Thus, if Bassett caused plaintiffs to believe that Ewald or Bassett Direct were its agents, then Bassett is liable on contracts plaintiffs entered into with those parties, and plaintiffs will be unable to prove the third element, namely, that they suffered pecuniary damage. On the other hand, if Bassett did not so deceive or mislead plaintiffs, then it cannot be liable under the DTPA because plaintiffs cannot prove the second element. Under these circumstances, plaintiffs claim under the DTPA would seem to add nothing to plaintiffs' complaint.

A claim under the DTPA differs from a claim based on apparent agency, however, in that to succeed on a claim of apparent agency a plaintiff must prove that his or her reliance on the actions of the principal was reasonable. *McDonald v. Century 21 Real Estate Corp.*, 111 Wis.2d 600, 604, 331 N.W.2d 606 (Ct. App. 1983). While the reasonableness of a plaintiff's reliance may be relevant in considering whether a representation materially induced the plaintiff to sustain a pecuniary loss, the Wisconsin Supreme Court has held that reasonable reliance is not an element of a claim under the DTPA. *Novell v. Migliaccio*, 2008 WI 44, ¶ 27, 309 Wis.2d 132, 749 N.W.2d 544. Thus, plaintiffs could conceivably prevail on their DTPA claim even if they are unable to

15

prove that their assumption that they were dealing directly with Bassett was reasonable. In addition, plaintiffs who prevail on a claim under the DTPA are entitled to reasonable attorneys fees and costs. Wis. Stat. § 100.18(11)(b). I therefore conclude that plaintiffs have stated a claim under the DTPA, and Bassett's motion will be denied as to that claim as well.

## C. Fraud

The remaining counts of the second amended complaint sound in fraud. In Count Three, plaintiffs assert a claim of theft by fraud in violation of section 943.20 of the Wisconsin Statutes against Bassett and Wahlquist based on their failure to disclose the fact that the liquidation sale was operated like a Ponzi scheme in that orders could only be filled if additional customers made purchases; that the furniture ordered by plaintiffs did not then exist; that orders for the furniture customers purchased were not placed immediately; and that the money paid by customers was used to pay commissions due Wahlquist for the sales and outstanding debt owed to Bassett. (2d. Am. Compl. ¶ 23.) Count Four asserts a claim for racketeering in violation of the Wisconsin Organized Crime Control Act, Wis. Stat. § 946.82(3) predicated on the same allegedly fraudulent acts that form the basis of Count Three, as well as a threat of continuing racketeering activity based on the defendants' plans for 20 to 25 closings of other underperforming Bassett Direct stores over the period 2008-2010. (*Id.* ¶ 39.) Count Five alleges conspiracy to commit fraud against the plaintiffs based on the same allegations as Counts Three, and Count Six asserts a common law fraud claim which appears in all respects identical to the statutory claim in Count Three. Finally, Count Seven asserts a federal claim for racketeering under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, also predicated on the same allegations of fraud and the threat of continuing activity upon which Count Four is based.

16

Under Wisconsin law, the elements of a fraud claim are (1) a false representation of fact; (2) made either knowing that it was untrue, or recklessly not caring whether it was true or false; (3) made with intent to deceive the plaintiff in order to induce the plaintiff to act on it to plaintiff's pecuniary damage; and (4) plaintiff's detrimental reliance on the representation as true. *Malzewski v. Rapkin,* 2006 WI App 183, ¶ 17, 296 Wis.2d 98, 723 N.W.2d 156, 162. Wisconsin courts have held, however, that a fraudulent representation can also take the form of a failure to disclose a material fact. *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, 283 Wis.2d 555, 699 N.W.2d 205 ("When there is a duty to disclose a fact, the law has treated the failure to disclose that fact 'as equivalent to a representation of the nonexistence of the fact.'") (quoting *Hennig v. Ahearn*, 230 Wis.2d 149, 165, 601 N.W.2d 14 (Ct.App.1999)). The Wisconsin Supreme Court has held that a party to a business transaction has a duty to disclose a fact where:

> (1) the fact is material to the transaction; (2) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact.

*Kaloti Enterprises*, ¶ 20. Thus, a defendant can be liable for fraudulent concealment when, having a duty to disclose, he intentionally fails to do so with the intent to deceive the plaintiff and thereby induces the plaintiff to act to his or her detriment.[2] *Id.* at ¶ 13. The Wisconsin Court of Appeals has adopted the same principles in defining the contours of the crime of theft by fraud as defined

---

[2] In *Tietsworth v. Harley-Davidson, Inc.*, the Wisconsin Supreme Court noted it was an open question in Wisconsin whether the duty to disclose that it had recognized in real estate and business transactions extends more broadly to sales of consumer goods. 2004 WI 32, ¶ 15, 270 Wis.2d 146, 677 N.W.2d 233. Neither party offers any reason why the same general principles would not apply to a consumer transaction.

by section 943.20(1)(d) of the Wisconsin Statutes. *State v. Ploeckelman*, 2007 WI App 31, ¶¶ 18-19, 299 Wis.2d 251, 729 N.W.2d 784.

In essence, though they invoke several different statutory vehicles, plaintiffs' claim is that Bassett and Wahlquist are liable to them in fraud because they conspired to conceal the fact that the money they paid to Bassett Direct during its liquidation sale would not be used to buy the furniture they had ordered, but instead to pay Wahlquist's commissions and Bassett's pre-existing debt. Despite the forceful argument of the defendants that the complaint fails to satisfy the more stringent pleading standard of *Twombly* and *Iqbal*, I find that the facts alleged are sufficient to nudge the claim, at least in one of its guises, "across the line from conceivable to plausible." *Twombly*, 550 U.S. 570; *Iqbal*, 129 S.Ct. at 1951.

### 1. Conspiracy To Commit Theft by Fraud

In their Second Amended Complaint, plaintiffs have asserted claims for statutory theft, common law fraud, and conspiracy as three separate counts. The claim of theft is in reality a claim of theft by fraud contrary to section 943.20(1)(d) of the Wisconsin Criminal Code, made actionable in civil proceedings by section 895.446(1) of the Wisconsin Statutes. Wis. Stat. §§ 943.20(1)(d), 895.446(1). The claim under section 943.20(1)(d) seems identical to plaintiffs' claim of common law fraud, except that section 895.446(3) authorizes recovery of, in addition to actual damages, all costs of investigation and litigation, and exemplary damages of up to three times actual damages. Plaintiffs have also asserted a separate claim of civil conspiracy.

Unlike criminal conspiracy, a civil conspiracy claim is not an independent cause of action, but is only the mechanism for subjecting co-conspirators to liability when one of their members committed a tortious act. *Beck v. Prupis*, 529 U.S. 494, 503 (2000). A civil conspiracy is an

Case 1:08-cv-01035-WCG   Filed 10/20/09   Page 18 of 27   Document 41

"agreement between two or more persons to commit an unlawful act that causes damage to a person or property." *Black's Law Dictionary*, 305 (7th ed. 1999). Each member of the conspiracy is liable for the actions of others committed pursuant to and in furtherance of its object. Thus, a civil conspiracy "'is not independently actionable; rather it is a means for establishing vicarious liability for the underlying tort.'" *Beck v. Prupis*, 529 U.S. at 503 (quoting *Halberstam v. Welch*, 705 F.2d 472, 479 (C.A.D.C.1983)). Plaintiffs' claim for conspiracy (Count Five), to the extent it constitutes a separate claim from Counts Three and Six, will therefore be dismissed.

Of course, this does not mean that conspiracy is out of the case. Counts Three and Six are predicated on plaintiffs' allegation that Bassett and Wahlquist conspired to defraud them out of the payments they made to Bassett Direct for new furniture. Relying on *Twombly* and *Iqbal*, however, the defendants argue that plaintiffs' conclusory allegation of a conspiracy is not enough to get past a motion to dismiss and open the doors to the time-consuming and expensive discovery that a class action entails. Although the defendants do not dispute plaintiffs' allegation that each received payments from the liquidation sale, they argue that this hardly constitutes evidence of a conspiracy to defraud the plaintiffs under the circumstances of this case. Wahlquist was paid a commission on sales to which it was entitled under its agreement with Ewald, and Bassett was paid what it was owed out of the store's general account pursuant to its contractual agreements with Ewald giving it a security interest in such funds. Unlike money paid to a building contractor for improvements to real estate, defendants point out, there is no law requiring that down payments for the purchase of new furniture or other consumer goods be held in trust. *See, e.g.*, Wis. Stat. § 779.16. Thus, a retailer such as Bassett Direct who accepts down payments for future delivery of goods has the right to place the down payments it receives in its general funds to conduct business as it sees fit. And

19

since Bassett had a security interest in all of Bassett Direct's accounts, it acted lawfully in accepting those funds in satisfaction of Bassett Direct's antecedent debt. In essence, defendants argue that they cannot be liable receiving money to which they were lawfully entitled.

Absent prior knowledge on the part of the defendants that plaintiffs would likely not receive the furniture for which their payments were being accepted, and an agreement between them to nevertheless induce the plaintiffs to make the payments, the defendants are correct — they would not be liable. But plaintiffs have alleged that the defendants did have such knowledge and that they agreed to conduct the sale anyway in order to defraud the plaintiffs of their funds. Moreover, the facts alleged in support their claims are not so lacking as to deprive their claims of the plausibility needed to go forward.

Generally, a liquidation sale is intended to sell off existing inventory. Indeed, according to their Agreement, Ewald expressly retained Wahlquist "to manage and conduct the sale of the inventory of [the Appleton Bassett Direct store] and any other merchandise brought in for this sale . . . ." (Dau Aff., Ex. B, ¶ 1.) Contrary to the language of the Agreement, however, Wahlquist's sales were not limited to the store's existing inventory and "any other merchandise brought in for this sale." (*Id.*) The sales manager and the temporary sales associates Wahlquist provided accepted orders on new furniture and collected the down payments which were then deposited in the store's account. Once deposited in the store's bank account, the funds were then used to pay the commissions totaling 13% due Wahlquist and its sales associates on a weekly basis with the balance left in the account subject to Bassett's security interest. In addition, Wahlquist's commissions were computed on the gross sales price of the furniture ordered, even if only a partial down payment had been received, and Ewald, which was insolvent, was heavily indebted to Bassett. (2nd Am. Compl.

20

¶¶ 16, 18.)  At the same time, according to the complaint, Bassett refused to ship new furniture orders unless Ewald paid Bassett "a multiple of the wholesale cost (*e.g.*, double) for that order." (*Id.* ¶ 17.)  Over the course of the twelve-week sale, plaintiffs allege that Bassett received approximately $679,628, most of which was in payment of antecedent debt owed by Ewald, and Wahlquist was paid approximately $319,480 in commissions.  (*Id.* ¶ 20.)  In the meantime, some 188 customers who had paid as much as $10,000 or more for new furniture received nothing in return.  (*Id.* ¶ 29.)

Yet, even these facts are not enough to state a claim against Bassett and Wahlquist for conspiracy to defraud.  In *Twombly* the Court held that an allegation of parallel conduct and a bare assertion of conspiracy were not sufficient to state a § 1 Sherman Act claim: "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  550 U.S. at 556-57.  To state a § 1 claim, the Court held, allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Id.* at 557.  If Ewald had simply gone out on its own and independently hired an independent liquidator to conduct its sale, plaintiffs' allegation of a conspiracy would be insufficient.  It would simply show parallel conduct that happened to benefit both Wahlquist and Bassett.

Here, however, plaintiffs have provided a context that raises at least "a suggestion of a preceding agreement."  Plaintiffs allege that sometime in 2007 Bassett and Wahlquist "formed and undertook a joint venture with one another to conduct liquidation sales over the period of 2008 through 2010 at approximately 20 to 25 underperforming BASSETT FURNITURE DIRECT stores, plus liquidation sales at a substantially greater number of BASSETT FURNITURE DIRECT stores

21

to be remodeled or converted."[3]  (2nd Am. Compl. ¶ 13.)  According to the complaint, Wahlquist referred to Bassett "as its 'partner' in these liquidation sales" (*id.* ¶ 13), and according to a Wahlquist letter referenced in the complaint and placed in the record by Bassett, Wahlquist had "done a lot of business with Bassett over the years" and had in its employ an "ex-Bassett veteran of 16 years."  (Dau Aff., Ex. D., ex. 5.)  These allegations, taken together and viewed in context, are sufficient to state a claim for the underlying conspiracy plaintiffs claim existed between Bassett and Wahlquist.  They are at least sufficient to permit plaintiffs an opportunity to conduct some limited and narrowly targeted discovery concerning the relationship between Bassett and Wahlquist and the facts surrounding this and perhaps other liquidation sales.

Defendants also contend that the complaint fails to state a claim for conspiracy to commit fraud under the heightened pleading standard of Rule 9(b).  As discussed earlier, Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The Plaintiff must plead the "who, what, when,

---

[3] Notwithstanding plaintiffs' characterization of the relationship, a review of the specific facts alleged actually shows that there was not a joint venture between Bassett and Wahlquist because there was no sharing of profits.  Although Wahlquist profited from its sales of Bassett's products, that would be true of any salesman or group of salespeople, none of whom generally become joint venturers (i.e., partners) with their employers.  When one's profits are the result solely of commissions received off of gross sales, he cannot be said to be in a "venture" with the manufacturer – he is simply a reseller running his *own* business.   That is, the profits Wahlquist received are not shared profits of any *venture* because they are based solely on its gross sales.  *Kidz Cloz, Inc. v. Officially For Kids, Inc.,* 320 F. Supp.2d 164, 174 -175 (S.D.N.Y. 2004) (no joint venture where sales commissions were determined on an order-by-order basis and based on a percentage of the invoice amount); *Catalano v. N.W.A., Inc*., 1998 WL 777023, *6 (D. Minn. 1998) ("Receiving a fixed commission or referral fee is not receiving a percentage of the profits.") (citing *Wilson v. American Trans Air, Inc.,* 874 F.2d 386, 392 (7th Cir.1989)); *Godwin v. Camp,* 295 F. 785, 791 (7th Cir. 1924) (finding no joint venture because the designer 'was paid as compensation for her services fixed commissions upon the gross sales, without reference to whether the business made a profit or suffered a loss, and thus whether or not there were any net or joint proceeds to divide.")

22

where, and how." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990). This specificity requirement extends only to the particulars of the allegedly misleading statement or omission itself; the other elements of fraud, such as intent, knowledge, and reliance, may be averred in general terms under the notice-pleading standard. *Id.; see also* Fed. R. Civ. P. 9(b). Defendants contend that plaintiffs have failed to allege fraud with the required particularity here.

I disagree. Plaintiffs allege with enough particularity the facts that they claim were fraudulently concealed from them in the course of the sale. The complaint alleges that "the defendants, directly and through their agents and co-venturer, failed to disclose the following material facts:

> a. The Ponzi-like scheme and all of the facts and circumstances alleged above, including but not limited to the facts alleged in ¶¶ 17, 18 and 19 above;
>
> b. That the filling of the order and delivery of the furniture and furnishings toward which payment was being made were contingent on others supplying money sufficient to pay the source of furniture (whether Bassett or another vendor);
>
> c. That by virtue of the agreements and conduct of the defendants alleged above, the sales transaction would not be processed in accordance with customary and normal commercial standards, including but not limited to the immediate placement of the order and contemporaneous satisfaction of any conditions needed for the prompt filling of the order by the manufacturer/supplier in the ordinary course of business;
>
> d. That there was no reasonable basis for giving a timeframe nor for any expectation that the furniture would probably be delivered;
>
> e. That, in contrast to the normal course of a sale transaction, the customer's money would not actually be applied toward the purchase of furniture and furnishings;

f. That the defendants did not intend to process the furniture order in the normal course or in accordance with customary commercial standards; and

g. That the furniture and furnishings being ordered did not exist.

(2nd Am. Compl. ¶ 23.) In essence, plaintiffs allege that the defendants knew but failed to disclose at the time the sale was conducted that there was a substantial likelihood that customers who made partial or full payments for new furniture would lose their money.

The who, when, where and how are also sufficiently plead. Of course, in a fraudulent concealment claim there is no who, when, where or how, since the essence of the claim is that facts material to the transaction that should have been disclosed were not disclosed by any person at any time, in any place or in any manner. But plaintiffs have described in their complaint the facts they claim gave rise to the duty to disclose, and they attached to their complaint a sales report which sets forth the dates and terms of the sales transactions of each of the representative plaintiffs, as well as the proposed class. (*Id.*, Ex. B.) The Wahlquist sales associate each plaintiff dealt with is identified in the report by his or her initials[4], and the complaint alleges that each of the transactions took place at the Appleton Bassett Direct store. (*Id.* ¶ 22.) This information is sufficient to meet the heightened pleading requirements of Rule 9(b).

Finally, Bassett offers a weak argument that plaintiffs' statutory claim for theft by fraud fails because section 943.20 is "directed at the taking of 'movable property' and tangible documents

---

[4] Of course, as Wahlquist observes, the identity of the sales associates is largely irrelevant. It is neither likely, nor necessary to plaintiffs' claim, that the temporary sales associates that Wahlquist hired as independent contractors knew of the allegedly fraudulent scheme. Walquist agreed to conduct and manage the sale and did so through a sales manager and temporary sales associates it arranged for. (2nd Am. Compl., Ex. B, ¶¶1-4.) If it did so with the knowledge and intent plaintiffs allege, that is sufficient.

24

embodying intangible property" and does not apply to the fraudulent taking of money. (Bassett Br. In Supp. of Mot. To Dismiss at 14.) If true, it would appear the many people have been unjustly convicted and sent to prison. Clearly, money constitutes property within the meaning of the statute. *See* 943.20(2)(b) ("'Property' means all forms of tangible property, whether real or personal, without limitation including electricity, gas and documents which represent or embody a chose in action or other intangible rights."); *see also State v. Timblin,* 2002 WI App 304, 259 Wis. 2d 299, 657 N.W.2d 89 (holding that obtaining money through misrepresentation is theft by fraud in violation of § 943.20(1)(d)).

I therefore conclude that plaintiffs have stated a claim against the defendants for conspiracy to commit theft by fraud. The defendants motion to dismiss Counts Three and Six will therefore be denied.

### 2. Counts Four and Seven: WOCCA and RICO

Finally, the Plaintiffs allege that both Bassett and Wahlquist violated Wisconsin's Organized Crime Control Act ("WOCCA"), *see* Wis. Stat. § 946.82, and the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See* 18 U.S.C.A. § 1962. Both Acts are similar in nature as their primary aim is to "impose sanctions against this subversion of the economy by organized criminal elements and to provide compensation to private persons injured thereby." Wis. Stat. § 946.81.

The gist of the Plaintiffs' claim is that the Defendants were both engaged in a pattern of criminal activity (i.e. theft and fraud) and will continue to do so. The Defendants note that courts are careful to screen out garden variety fraud claims masquerading as RICO claims, and one of the factors courts look to is the length of time over which the alleged racketeering occurred:

Case 1:08-cv-01035-WCG   Filed 10/20/09   Page 25 of 27   Document 41

As the Supreme Court explained in *H.J. Inc.,* the continuity requirement exists to give effect to Congress's clear intention that RICO target long-term criminal behavior, 492 U.S. at 242, as opposed to more discrete acts of fraud. Continuity can be "both a closed-and open-ended concept." *Midwest Grinding*, 976 F.2d at 1022. Closed-ended continuity, which is all that is even arguably present in this case, refers to criminal behavior that has come to a close but endured for such a substantial period of time "that the duration and repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future." *Midwest Grinding,* 976 F.2d at 1022-23. (An open-ended period, in contrast, is "a course of criminal activity which lacks the duration and repetition to establish continuity." *Midwest Grinding,* 976 F.2d at 1023. A RICO plaintiff may satisfy the open-ended continuity requirement by showing past conduct which "by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J. Inc.*, 492 U.S. at 242.)

*Jennings v. Auto Meter Products, Inc.,* 495 F.3d 466, 473 (7th Cir. 2007).

All that is alleged here is a pattern of some nine months of racketeering, i.e., the period during which Ewald and Wahlquist's sales proceeds were being used to pay down antecedent debt rather than to secure the customers' furniture orders. Courts have held that nine months is not a sufficiently long period of time to fall within RICO, and so to the extent the Plaintiffs are alleging a "closed end" period, that claim fails (which they essentially concede). *Id*. at 474 (holding that 10 months is not enough). To the extent they are alleging an "open end" period, the RICO claim also fails because the complaint itself pleads a distinct, and now ended, course of activity. Although the Plaintiffs suggest that Wahlquist is involved in Bassett liquidations elsewhere, it cannot be presumed that these situations involve an ongoing "Ponzi-type scheme" whereby consumers are losing their deposits. In short, this is precisely the sort of case that involves a discrete alleged fraud rather than an ongoing pattern of racketeering. Accordingly, the RICO claim will be dismissed.

Although WOCCA is patterned on RICO, the Plaintiffs allege that the time periods described above do not apply to WOCCA claims. They argue that the state legislature departed from the RICO model and created a separate statute, § 946.85, to deal with continuing criminal enterprises. That section makes it a Class E felony if he engages in a prohibited activity under

§ 946.83, and "[t]he activity is undertaken by the person in concert with 5 or more other persons, each of whom acted with intent to commit a crime and with respect to whom the person occupies a supervisory position; and . . . the person obtains gross income or resources in excess of $25,000 from the activity." Wis. Stat. § 946.85. Plaintiffs argue that because this section creates steeper penalties for a "continuing criminal enterprise" (as opposed to a pattern of racketeering activity), the legislature has implicitly opted out of the federal RICO's continuity jurisprudence.

There is, however, no support for such a distinction, and that is likely because there is nothing within § 946.85 that suggests the time involved in a "continuing" enterprise is any different than the pattern of activity described in § 946.83. In fact, § 946.85 explicitly incorporates activity under § 946.83 – the only difference is that the prohibited activity must involve five or more persons with intent to commit a crime and $25,000 in proceeds. As such, there is no indication that the result under WOCCA should be any different than the result under RICO. Accordingly, both claims will be dismissed.

### III. Conclusion

**IT IS THEREFORE ORDERED** that the defendants' Motions to Dismiss are **GRANTED** as to Counts Four (WOCCA), Five (conspiracy), and Seven (RICO); however, the motions are **DENIED** as to Counts One (breach of contract), Two (DTPA), Three (theft), and Six (fraud). The Plaintiff's motion to strike or, alternatively, to file a sur-reply is also denied. The Clerk is directed to set this matter for a Rule 16 scheduling conference.

Dated this   20th   day of October, 2009.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

27